**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Datavault AI, Inc., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DOES 1-50; ROE CORPORATIONS 1-50, and XYZ LLCS 1-50,<br><br>Defendants. | Case No.:<br><br>**JURY DEMAND** |

# COMPLAINT

Plaintiff Datavault AI, Inc. ("Datavault" or "the Company"), by and through its counsel of record, the law firm of Dickinson Wright PLLC, submits its Complaint against Does 1 through 50, Roe Corporations 1-50, and XYZ LLCs 1-50, inclusive, and alleges as follows:

## I. SUMMARY

1. This Complaint arises from a fraudulent scheme by Defendants involving the making of materially false and misleading statements and unlawful "naked" short selling for the purpose of depressing artificially the value of the common stock of Datavault – a dynamic and fast-growing artificial intelligence company, traded on the Nasdaq Stock Market ("Nasdaq").

2. Defendants' scheme involved at least two fraudulent methodologies. First, Defendants knowingly or recklessly made materially false and misleading statements regarding Datavault to reduce investor confidence in the company, depress its common stock valuation, and defame Datavault. Second, Defendants orchestrated short sales, but never "located" (*i.e.*, borrowed, arranged to borrow, or had reasonable grounds to believe that the securities could be borrowed) the shares that they sold, in violation of the applicable federal securities regulation requiring short sellers to locate the shares to borrow and sell. 17 C.F.R. § 242.200 – § 204.204. In

each such instance, Defendants' trading constituted "naked" short selling, which was a further violation of the applicable federal securities regulation.

3. Defendants engaged in this fraudulent trading scheme because it was more profitable than following the law. Defendants would not have been able to carry out their short sales, and thus could not have profited as they did, if they had followed the rules governing short sales. As a result of their fraudulent conduct, Defendants damaged Datavault.

4. Moreover, Defendants additionally used their non-compliant short sales to deflate artificially the price of Datavault's shares, enabling Defendants in turn also to acquire Datavault stock at a cheaper price.

5. "Short and distort" schemes by Defendants, as here, involve Defendants taking steps to conceal their fraudulent scheme and misconduct. Central to the scheme is the dissemination, often in internet chat rooms or on various internet media, materially false and misleading statements about the issuer designed to depress the issuer's stock price. Then, upon information and belief, Defendants know, or are reckless in not knowing, that their short sales violate federal securities regulations requiring them to obtain or otherwise locate Datavault shares to borrow to effect the naked short sales.

6. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1-50, Roe Corporations 1-50, and XYZ LLCs 1-50, inclusive, are unknown to Plaintiff, which therefore sues said Defendants by such fictitious names. Plaintiff will amend this Complaint to state the true names and capacities of said fictitious defendants when they are discovered.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa because Plaintiff's claim arises under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(a)) ("Exchange Act").

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff, a Delaware corporation with headquarters in Beaverton, Oregon, through its May 2025 strategic acquisition of Lisle, Illinois-based CompuSystems, Inc., has more than one-half of its employees located in the Northern District of Illinois, and for the second and third quarters of 2025 a majority of the Company's revenues derive from its Northern District of Illinois operations. Accordingly, a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Illinois.

9. In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, made use of the means or instrumentalities of interstate communication in connection with the transactions, acts, practices, and courses of business alleged herein.

## III. PARTIES: PLAINTIFF AND DEFENDANTS

10. Plaintiff, Datavault AI, Inc. is a Delaware corporation with its corporate headquarters located in Beaverton, Oregon and principal operations located in Lisle, Illinois. At all times relevant to this Complaint, the common stock Plaintiff traded on the Nasdaq under the symbol DVLT.[1]

11. Defendants each made materially false and misleading statements about Datavault on various internet media.

---

[1] Plaintiff has filed herewith its corporate disclosure statement in compliance with Fed. R. Civ. P. 7.1 and Local Rule 3.2.

12. Upon information and belief, Defendants each took positions to short Datavault stock without having borrowed or arranged to borrow securities to make delivery to the buyer within the standard settlement period, resulting in failures to deliver Datavault shares and manipulation of Datavault's share price. Further, upon information and belief, certain Defendants acted in concert with other Defendants to enable and perpetuate the fraudulent and manipulative trading.

## IV. THE DATAVAULT AI STORY: 2025

13. Datavault AI Inc., headquartered in Beaverton, Oregon, is a leading data technology and licensing company driving innovation in the Web 3.0 era. Formerly WiSA Technologies, Inc. ("WiSA"), the Company rebranded to Datavault AI Inc. in February 2025 to reflect its focus on AI-driven data visualization, valuation, and monetization, alongside high-performance computing (HPC) solutions.

14. Datavault's operations and product offerings come from two core business divisions: data science and acoustic science. The data science division licenses proprietary software, including the patented Data Vault® platform, which uses blockchain, AI, and machine learning to enable secure data management, real-time valuation, and tokenization. Serving industries such as biotech, fintech, healthcare, and sports & entertainment, Data Vault® empowers clients to maintain ownership and monetize data assets, addressing a $700 billion market opportunity. The acoustic science division licenses immersive audio technologies, including ADIO®, WiSA®, and Sumerian®, for applications in sports, entertainment, automotive, and venue markets, enhancing user experiences through spatial and multichannel sound.

15. Datavault has secured strategic partnerships with IBM (Partner Plus program) (as reported publicly in a press release on March 24, 2025), Dolby Laboratories (as reported publicly

in a press release on February 12, 2025), NYIAX (as reported publicly in a press release on March 17, 2025 and disclosed in a Form 8-K filed on the same date), and Kove IO (as reported publicly in a press release on May 5, 2025), positioning it for significant growth. Datavault projects revenues of $12-15 million for the second half of 2025 and $40-50 million for 2026, driven by various acquisitions and expanding licensing agreements.

16. Datavault's data science and acoustic science divisions have produced valuable trade secret and patent portfolios key to protecting Datavault's competitive advantage in data monetization and tokenization technologies. These portfolios cover areas such as blockchain, AI-driven data monetization, and immersive audio, and support secure data tokenization and applications, such as Name, Image, and Likeness (NIL) token minting, targeting a $2.55 billion market by mid-2026.

17. On January 6, 2025, Datavault, then still operating as WiSA, filed with the Securities and Exchange Commission ("SEC") a Form 8-K disclosing the material event of the closing of the Company's purchase of certain intellectual property assets of Data Vault Holdings Inc. ("DVH"), along with the Company's hiring of Nathanial Bradley as CEO and Director of Datavault.

18. In connection with the closing of the Company's purchase of certain DVH intellectual property assets, the Company disclosed that the successful integration of the acquisition by WiSA of certain intellectual property assets of DVH creates a larger and more robust company with significant synergies. Datavault (then still WiSA) further disclosed that, as a direct result of the acquisition, the Company is positioned to grow through acquiring complementary niche technologies, which further will leverage their core technologies.

19. Previously, in connection with WiSA's acquisition of certain intellectual property assets of DVH, WiSA filed with the SEC a Schedule 14A, pursuant to Rule 14a-101 promulgated under the Exchange Act, in which WiSA disclosed its receipt and consideration of a fairness opinion[2] by Lake Street Capital Market LLC ("Lake Street") dated November 24, 2024, and the full text of which WiSA attached to its Schedule 14A as Exhibit D thereto. WiSA's specific disclosure read (at page 35 of the Schedule 14A): "Lake Street noted that the Purchase Price for the Transferred Assets on November 24, 2024 was approximately $79 million based on the closing price of the Company's stock on November 22, 2024. Lake Street also noted that the estimated value of the Data Vault intellectual property ranged between $77 million and $145 million, the total value of the Adio intellectual property ranged between $189 million and $356 million, and the total value for the Transferred Assets ranged between $266 million and $501 million." The "Transferred Assets" are the DVH intellectual property assets transferred to Datavault in its transaction with DVH.

20. In relation to the hiring of Nathanial Bradley, Datavault disclosed that Mr. Bradley holds more than 70 patents, founded the Intellectual Property Network Inc., and found and invented AudioEye, where he pioneered cloud-based assistive technologies, earning recognition for his contributions to internet accessibility. Datavault further disclosed that Mr. Bradley's extensive experience includes roles as Chief Technology Officer for Marathon Patent Group (currently named Marathon Digital Holdings, Nasdaq: MARA) and involvement in significant acquisitions within the internet radio industry.

[2] Fairness opinions, which are not asset valuations, typically are not explicit requirements under Generally Accepted Accounting Principles for inclusion in financial statements.

21. On February 14, 2025, Datavault filed with the SEC a Form 8-K disclosing the issuance of common stock and warrants for gross proceeds to Datavault of $5.4 million.

22. On March 17, 2025, Datavault filed with the SEC a Form 8-K disclosing the alliance between Datavault and NYIAX which integrated Datavault's patented Information Data Exchange (IDE) with the Data Vault platform which in turn utilizes NYIAX's cutting-edge blockchain exchange technology. NYIAX describes itself on its website as "[b]uilt on the Nasdaq Financial Framework and powered by blockchain technology, NYIAX merges the precision, structure and transparency of the financial markets with the needs and creativity of advertising." NYIAX further states on its website that it "deliver[s] software and a next-generation exchange that enables in-house marketers, agencies, and media owners to maximize growth." Datavault disclosed that the collaboration leverages NYIAX's capabilities, enabling businesses to scale, list, price, and trade data and digital assets efficiently, creating new revenue opportunities for Datavault. Additionally, Datavault disclosed that the alliance with NYIAX will allow for significant growth potential, with the global data monetization market expected to exceed $700 billion by 2025.

23. On March 31, 2025, Datavault filed with the SEC a Form 10-K disclosing, among other things, its audited annual financial statement. Datavault disclosed an increase in year-over-year revenue of 28%. Datavault further disclosed an increase from a gross deficit of $3.5 million to a gross profit of $0.4 million. Moreover, Datavault disclosed an increase in assets from $4.8 million to $100.6 million.

24. On March 31, 2025, Datavault filed with the SEC a Form 8-K disclosing the issuance of senior secured convertible notes and warrants to raise capital. Datavault disclosed the

issuance of $16.7 million of senior secured convertible notes, along with the issuance of warrants to purchase 19,346,101 shares of common stock at the price of $0.8615 per share.

25. On April 14, 2025, Datavault filed with the SEC a Form 8-K disclosing the finalization of the entry of Datavault and NYIAX into Lock-Up Agreements relating to the NYIAX/Datavault alliance.

26. On May 14, 2025, Datavault filed with the SEC a Form 10-Q disclosing the quarterly financial statements of the Company. Datavault disclosed a quarterly year-over-year increase in net revenue of 147%. Datavault further disclosed an increase from a gross deficit of $83,000 to a gross profit of $69,000.

27. On May 20, 2025, Datavault filed with the SEC a Form 8-K disclosing the Company's finalization of its strategic acquisition of the assets of CompuSystems, Inc. ("CompuSystems"). Datavault disclosed that it expects this acquisition to position Datavault for strong growth through monetizing the historical, present and future data of CompuSystems and leveraging Datavault's Web 3.0 technologies. Datavault further disclosed its expectation that the acquisition should drive revenue significantly and contribute $15-$20 million to 2026 revenue.

28. On May 20, 2025, Datavault filed with the SEC a Form 8-K announcing the closing on the acquisition of additional capital through the issuance of senior convertible notes and warrants. Datavault further disclosed that the senior convertible notes were valued at $16.7 million. Datavault further disclosed the issuance of 19.3 million warrants with an exercise price of $0.8615/share.

29. On June 23, 2025, Datavault filed with the SEC a Form 8-K/A (an amended Form 8-K), disclosing the audited financial statements of the recently acquired CompuSystems. Datavault disclosed the year-over-year increase in net income of CompuSystems of $4 million as

of December 31, 2024. Datavault further disclosed a year-over-year increase in net income of $1.1 million for the first quarter of 2025.

30. Datavault continues to operate the assets acquired from CompuSystems as the CSA Division of Datavault, with core operations maintained in Lisle, Illinois. The CSI Division of Datavault continues to operate from Lisle and describes its CSI Division as "a premier provider of registration, data analytics, and lead management services for live events, offering cutting-edge solutions and unparalleled customer support to clients in the trade, association, corporate, and government event markets."

31. On July 7, 2025, Datavault filed with the SEC a Registration Statement on Form S-3, registering $250 million worth of securities (common stock, preferred stock, warrants, debt securities, rights, and units) for offer and sale pursuant to Rule 415 under the Securities Act of 1933 as a shelf registration. Pursuant to this registration statement, Datavault may offer and sell any combination of securities for an aggregate offering price not exceeding $250 million.

32. Certain companies with publicly traded securities, including those with securities traded on the Nasdaq, must file a Form 8-K, which, as set forth on the SEC's website, is the "current report" companies must file with the SEC to announce major events that shareholders should know about. (https://www.sec.gov/answers/form8k.htm).

33. In addition to the disclosures that Datavault made in 2025 in its required filings with the SEC, Datavault also published certain press releases in 2025 that communicated positive and newsworthy developments about the Company.

34. On February 12, 2025, Datavault (prior to its name change from WiSA) published a press release announcing an interoperability license agreement with Dolby. Datavault announced that this agreement allows Datavault to collaborate directly with system-on-chip providers to

integrate its patented WiSA E Express multichannel wireless audio software into Android and future Linux-based streaming audio-visual platforms. Datavault further announced this agreement simplifies audio, addresses the long-standing issue of poor sound quality in televisions and set-top boxes (STBs), ensures robust performance over existing Wi-Fi connections, and introduces a lower-cost activation model designed to meet consumer demand.

35. On March 24, 2025, Datavault published a press release announcing its inclusion in IBM's prestigious Partner Plus program. Datavault announced that as one of IBM's 500 global partners, Datavault will leverage IBM watsonx™ to enhance its AI agents, including Data Vault Bank, DataScore and DataValue, driving the next wave of AI-powered financial modeling and tokenization. Datavault further announced that the Company's inclusion in IBM's Partner Plus program will accelerate adoption of AI-driven data valuation and licensing across industries. Datavault stated that with AI-powered data assets projected to become the next trillion-dollar market, this program partnership with IBM positions Datavault as a leader in AI-driven financial modeling.

36. On June 4, 2025, Datavault published a press release announcing a strategic licensing agreement with GFT Rewards to deploy ADIO-enabled Web 3 mobile rewards across major distribution channels from airports and retail chains to movie exhibitors, college campuses and Ride-Hailing networks. GFT Rewards describes itself on its website as "an end-to-end collaborative, feature rich B2B and B2C service that makes it easier and more cost effective for retailers, brands, and agencies to create, budget, distribute, and settle both paper and digital rewards." Datavault announced that this licensing deal with GFT Rewards positions Datavault AI at the center of a rapidly modernizing retail marketing environment.

37. On June 17, 2025, Datavault published a press release announcing that the Company is poised to develop an AI-driven multi-modal machine learning system to support biofuel crop optimization, focusing on increasing fatty acid metabolism efficiency in brassica napus (canola) using high-performance computational modeling. Datavault announced this initiative supports the U.S. Environmental Protection Agency's goal to replace up to 140,000 barrels of crude oil per day with biofuels. Datavault further announced that aspects of this work will be facilitated with Datavault's research partners from the Computing and Data Sciences Directorate at the U.S. Department of Energy's Brookhaven National Laboratory.

38. On June 23, 2025, Datavault published a press release announcing the allowance for nine groundbreaking patents, including industry standard carbon credit tokenization and acoustics. Datavault announced that the Company believes the patents will secure Datavault's leadership in Web 3.0, media technology, and enterprise licensing, and that the patents are anticipated to create high-margin repeatable revenue streams.

39. On July 2, 2025, Datavault published a press release announcing the continued expansion and commercial progress through key appointments in high-profile industry events, including the Company's appointment to the White House Experience Advisory Council, and the Company's attendance at the 4th Annual Cowboys Gathering in Addison Texas.

40. On July 7, 2025, Datavault published a press release announcing the acquisition of SyncIN technology from Turner Global Media, LLC. Datavault announced that the SyncIN innovative platform will help connect consumers directly to content and enable stablecoin transactions via Web 3.0 crypto anchors using inaudible tone mobile quick response codes embedded in broadcasts. Datavault also announced a $40-50 million revenue goal for 2026 from this platform.

41. Despite these strong fundamentals, Datavault's stock price has been artificially suppressed compared to its peer companies with common stock traded on the Nasdaq, which trade at higher valuations despite similar data-driven business models.

## V. <u>Background on Short Sales of Stock and Governing Regulations</u>

42. A "short sale" is the sale of a security that the seller does not own or any sale that is consummated by the delivery of a security borrowed by, or for the account of, the seller. In order to deliver the security to the purchaser, the short seller will borrow the security, typically from a broker-dealer or an institutional investor. The short seller later closes out the position by purchasing equivalent securities on the open market, or by using an equivalent security it already owned, and returning the security to the lender. In general, short selling is used to profit from an expected downward price movement, to provide liquidity in response to unanticipated demand, or to hedge the risk of a long position in the same security or in a related security.

43. A "naked" short sale generally refers to selling short without the short seller having borrowed or arranged to borrow securities to make delivery to the buyer within the standard settlement period. SEC regulations address the requirements that sellers of securities are required to deliver, or arrange for delivery of, securities, and that buyers are entitled to receive delivery of securities purchased. These regulations include the timing requirements for such delivery and receipt, often referred to as the "settlement date." The SEC stated, in substance, that in enacting Regulation SHO, the SEC was concerned about the negative effect that failures to deliver securities may have on the markets and shareholders. A common example is large and persistent failures to deliver may deprive shareholders of the benefits of ownership, such as voting and lending, and sellers who fail to deliver securities on the settlement date may attempt to use this additional freedom to engage in trading activities to depress improperly the price of a security.

44. Regulation SHO, 17 C.F.R. § 242.200 – § 204.204, provides regulatory requirements applicable to short sales of equity securities. This is the regulation that the SEC adopted to address, *inter alia*, its concerns regarding persistent failures to deliver stock in connection with short selling of securities and potentially abusive "naked" short selling.

45. Under Regulation SHO, a seller is "deemed to own" a security only if that seller has a net long position in a security. 17 C.F.R. § 242.200(c).

46. Ordinarily (except in very limited circumstances not applicable here), sellers must "locate" shares prior to selling short.

47. In a "naked" short sale, a seller does not borrow or arrange to borrow securities in time to make delivery to the buyer within the standard settlement period.

48. The SEC designed Regulation SHO, in part, to reduce "failures to deliver," which occur when a seller fails to deliver securities that it has sold by the settlement date. Failures to deliver may negatively impact the market and shareholders. *See* Amendments to Regulation SHO, Exch. Act Rel. No. 34-60388 (July 27, 2009). Further, sellers that fail to deliver securities on the settlement date may, as here, attempt to use this additional freedom to engage in trading activities to depress improperly the price of a security. *See Id.* at 6-7. Further, by not borrowing securities and, therefore, risking that it will not be able to make delivery within the standard settlement period, the seller benefits by not incurring the costs of borrowing shares.

## VI. FACTUAL ALLEGATIONS REGARDING DEFENDANTS' FRAUDULENT CONDUCT

49. Upon information and belief, Defendants, who are persons or entities not yet known to Datavault, have published materially false and misleading information about Datavault and its officers and directors, for the purpose of disparaging Datavault's business and artificially suppressing Datavault's stock price. Examples, for purposes of the Complaint, include a user with

the pseudonym @Anonymousfinance ("Anonymous") on the Stockwits internet chat room and a poster ("LIP") on the LinkedIn platform.[3]

50. Stocktwits is a social media platform designed for sharing ideas between investors, traders, and entrepreneurs, and characterizes itself as "the best way to find out what is happening right now around the markets, companies and assets you care about."

51. LinkedIn is a social networking platform specifically designed for professional networking and career development. The intended use of LinkedIn is for users to create profiles to showcase their work experience, skills, and education, and to connect with other professionals, potential employers, and industry experts. LinkedIn users also can research companies and remain updated on industry news. It is not intended as a social media platform for sharing securities trading ideas.

52. Defendants made and continue to make the posts about Datavault visible to Datavault's stakeholders, potential investors, and employees on various internet media. The content of these statements demonstrate an intent to reduce investor confidence, reduce stock valuation, impair Datavault's legitimate capital raising efforts, discourage talent acquisition, and impair or delay consummation of contracts beneficial to Datavault's business.

53. Anonymous is among the unknown posters to the internet chat room Stocktwits contributing to the artificial suppression of DVLT's stock price. Anonymous' declarative statements, not speculative opinions, misrepresent the Company's financial condition and operations, damaging investor confidence.

---

[3] Although the LinkedIn platform provides a name for the person posting the comments, Plaintiff has not yet determined whether the name attached to the comments is a real person or a pseudonym. For that reason, Plaintiff has not yet included the name in the Complaint and is adopting the shorthand "LIP" for the as yet unknown LinkedIn poster.

54. For example, on June 15, 2025, Anonymous posted to Stocktwits stating that "$DVLT is a scam with no real revenue. Just another pump-and-dump scheme."

55. In truth and in fact, when Anonymous published the post on June 15, 2025, Datavault already had filed its Form 10-Q on May 15, 2025 with information regarding its first quarter 2025 performance. Specifically, Datavault had reported publicly $629,000 in first quarter 2025 revenue, projections of $12-15 million for second quarter 2025 revenue and $40-50 million for 2026. Moreover, as of June 15, 2025, Datavault has been operating and continues to operate two active divisions -- Data Science and Acoustic Science -- with partnerships including IBM, Dolby, and NYIAX.

56. Again, on June 20, 2025, Anonymous posted to Stocktwits stating that "$DVLT patents are worthless and unenforceable. They're just hyping old tech."

57. In truth and in fact, when Anonymous published the post on June 15, 2025, Datavault's patent portfolio, including Data Vault® and ADIO®, was the subject of Lake Street's fairness opinion described in considerable detail in Datavault's Schedule 14A filed with the SEC (Para. 20) and as further validated by virtue of the licensing agreements with Dolby Laboratories and NYIAX. Moreover, Datavault has engaged competent intellectual property counsel to enforce its intellectual property, which underpins the Company's innovative Web 3.0 and audio solutions.

58. Next, on June 25, 2025, Anonymous posted to Stocktwits stating that "$DVLT will be delisted from Nasdaq by Q3 2025 due to insolvency."

59. In truth and in fact, when Anonymous published the post on June 25, 2025, the common stock of Datavault had traded continuously and without interruption and continues trading daily on the Nasdaq, as it has throughout 2025. Striking is the fact that Anonymous wrote that these events "will" occur "by Q3 2025." Meanwhile, the Company is in Q3 and none of these

assertions have occurred. The Company's net $15 million convertible debt financing, announced April 3, 2025, and its projected revenue growth demonstrate the Company's financial stability, contradicting allegations of insolvency. Moreover, Anonymous mischaracterizes altogether Nasdaq listing qualifications processes, and the Nasdaq has not taken any steps towards commencing delisting.

60. An example of false statements on the LinkedIn platform are those published by LIP. Upon information and belief, the materially false and misleading statements posted by user LIP on LinkedIn have contributed to the artificial suppression of Datavault's stock price.

61. On a date uncertain in 2025,[4] LIP made a defamatory statement about Datavault proclaiming: "SCAM COMPANY, Please listent [sic] to us tech [sic] more about the ways we can streal [sic] your money, Scam Company Legit stay away from this and the criminals in charge Nathaniel especially, @datavault ai, @DVL @scam @fraudlent [sic] U.S. Securities and Exchange Commission[.]"

62. Datavault has audited financial statements and continues to be current in its SEC filings. Datavault is not now and never has been the subject of a SEC enforcement action.[5] Datavault has not stolen money. Datavault, and its officers are not criminals. LIP's statements have caused Datavault to suffer reputational harm, loss of revenue, loss of market share, and reduction in value and the Company's officers and directors to suffer reputational harm.

63. On another date uncertain in 2025, LIP commented in response to a post on Linkedin by Datavault's now CFO in which Datavault's now CFO wrote that he was "starting a

---

[4] The LinkedIn site identifies how many months old is a particular "comment" but does not provide the specific date of the "comment."

[5] The word "subject" is intended in the context that the Company is not now and never has been made aware of the SEC's Division of Enforcement examining any disclosures or activities of Datavault.

new position as CFO." LIP's comment was: "Congrats on Chief Fraud Officer, they are all so excited to lose every dollar invested, do you have the huevos to resond [sic] on social media platform of a company you have just pawned off onto a bigger scammer than yourself? We all little nate [sic] doesn't, Why would anyone want to work for a company that about to be delisted? Anyone who sees this should quickly decide against working with criminals, Little nate [sic] blocked me, did you ask him about Coinfield, Look at how good you guys are doing @ datavault ai, @DVL @scam @fraudlent U.S. Securities and Exchange Commission[.]"

64. Here as well, Datavault's compliant SEC filings and corporate disclosures evidence Datavault's financial health and absence of any Nasdaq delisting proceeding. Moreover, there are not now nor have there ever been "criminal" charges against any of Datavault's executives. These facts demonstrate the falsity of LIP's statements. Additionally, Coinfield never had any connection to Datavault. Thus, LIP's statements have caused Datavault to suffer reputational harm, loss of revenue, loss of market share, and reduction in value and the Company's officers and directors to suffer reputational harm.

65. LIP made several other shorter posts repeating the same false statements about Datavault and its officers and directors. These statements included: (i) "Anyone who sees this should quickly decide against working with criminals;" (ii) "At the end of the day you guys aren't even doing a good job at stealing money from investors. Who would want to give you money right now when you can't follow through on routine processes after months. I'll be sure to warn the masses when the need arises;" and (iii) "I'll continue to spread awareness and let others known that this is a scam company[.]"

66. Here again, Datavault is stable financially, operates legitimately, and demonstrates positive milestone as would be expected from an early stage company. There are not now nor have

there even been criminal charges against the company or its officers or directors. There has been no "stealing" from investors. There is no evidence of Datavault being a "scam company." Thus, LIP's statements have caused Datavault to suffer reputational harm, loss of revenue, loss of market share, and reduction in value and the Company's officers and directors to suffer reputational harm.

67. These declarative statements, not speculative opinions, misrepresent the Company's financial condition and operations, damaging investor confidence and continue to cause harm to Datavault and its officers and directors.

68. Defendants, including "Anonymous" and "LIP," made these and other statements with knowledge of their falsity, reckless disregard for their truth, and/or with negligence.

69. Defendants, including "Anonymous" and "LIP," made these and other false and defamatory statements with the intention of causing serious harm to Datavault's business and reputation, including causing harm to Datavault's business relationships.

70. LIP's false statements about Datavault and certain of its officers and directors were defamatory *per se* because LIP wrote that Datavault and certain of its officers and directors were "criminals" and "criminals in charge," thereby intending to and tending to injure the reputations of Datavault and certain of its officers and directors in business or trade.

71. Defendants' tortious conduct, including the tortious conduct of "Anonymous" and "LIP," has caused serious injury to Datavault and certain of its officers and directors.

## VII. REPEATED PRICE DECLINES IN DATAVAULT STOCK FOLLOWING POSITIVE NEWS

72. Positive news about a company, particularly material positive developments about a company, should cause an increase in the price of a company's stock.

73. Scholarly research reflects that positive news articles are associated with positive stock returns, while negative news articles are linked to negative stock returns. These expected

results suggest that news sentiment can play a significant role in shaping market movements. This relationship is particularly pronounced for smaller stocks. Tetlock, P.C., "Giving content to investor sentiment: The role of media in the stock market," THE JOURNAL OF FINANCE, 62(3), 1139-1168 (2007).

74. Similarly, Company specific news announcements containing positive or negative information significantly affect stock price movements. Positive news information positively affects the price, while negative information negatively affects the price. Easley, D., Hvidkjaer, S., and O'Hara, M., "Is information risk a determinant of asset returns?" JOURNAL OF FINANCE, 57(5), 2185-2221 (2002).

75. Not only has Datavault filed Forms 8-K disclosing material events that constitute positive news, but Datavault throughout 2025 has received positive news coverage on such media as FOX News, Bloomberg, Schwab Network, NewsMax, Christian Broadcast Network, Real Analysis, and FinTech TV Global.

76. Notwithstanding the positive news, on information and belief, coinciding with positive news has been manipulative downward pressure on the price of Datavault stock.

77. For example, on March 17, 2025, following Datavault's disclosure of the positive news regarding the alliance with NYIAX, Datavault's stock price decreased from $0.91 on the prior day's closing price to $0.86 on the closing on March 17, 2025, representing a decrease of $0.05 (5%) in the value of the stock. NYIAX, as disclosed in a Schedule 13D filed with the SEC on March 28, 2025, now beneficially owns 5.1% of the outstanding common stock of Datavault.

78. Again, on March 24, 2025, following Datavault's press release announcing its inclusion in IBM's prestigious Partner Plus program, the stock price decreased from $1.08 on the

prior day's closing to $0.95 on the closing on March 24, 2025, representing a decrease of $0.13 (12%) in the value of the stock.

79. On another date, March 31, 2025, following Datavault's filing a form 10-K with the SEC disclosing an increase in year-over-year revenue of 28%, and an increase from a gross deficit of $3.5M to a gross profit of $0.4M, Datavault's stock price again decreased from $0.90 on the prior day's closing to $0.85 on the closing on March 31, 2025, representing a decrease of $0.05 (5%) in the value of the stock.

80. On yet another date, July 7, 2025, following Datavault's registration to offer and sell any combination of securities for an aggregate offering price not exceeding $250 million, and the announcement of the acquisition of SyncIN technology from Turner Global Media, LLC, Datavault's stock price decreased from $0.72 on the prior day's closing to $0.67 on the closing on July 7, 2025, representing a decrease of $0.05 (6%) in the value of the stock.

81. Further, the common stock of Datavault continues to be the subject of identified fraudulent stock manipulation techniques.[6]

82. Upon information and belief, one such fraudulent manipulative device employed by Defendants against Datavault and its common stock is "marking the close," which is the practice of attempting to influence the closing price of a stock by executing purchase or sale orders at or

---

[6] The United States Supreme Court has held that a market transaction is manipulative if it is "intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977); *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199 (1976) ("intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities"). Moreover, United States Courts of Appeals have held that practices are manipulative if they are "aimed at deceiving investors as to how other market participants have valued a security," *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007), or if they "creat[e] a false impression of supply and demand for [a] security," *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir. 2001), *cert. denied*, 536 U.S. 923 (2002).

near the close of the market.[7] The SEC has long viewed "marking the close" as a manipulative practice under the Exchange Act and Rule 10b-5. "By artificially [depressing] the reported price of [a given] stock at the close of the market," a trader "intentionally interfere[s] with the factors upon which market value depends" and "convey[s] false information to the market as to the stock's price level and therefore as to the demand for the stock free of manipulative influences."[8]

83. Upon information and belief, another such fraudulent manipulative device employed by Defendants against Datavault and its common stock is "painting the tape," accomplished by placing sell orders at or near the close of the market in order to depress the reported closing price in small amounts at decreasing prices. "Painting the tape" often involves the use of multiple controlled or collaborating accounts to place pre-arranged sell orders in virtually identical amounts (itself the manipulative practice known as "matched trades") in order to place sell orders intended to maximize the negative impact on an issuer's price caused by the sales of the stock.

84. Upon information and belief, recent illustrative examples of such depressive manipulative tactics by Defendants to impact negatively the closing price of Datavault common stock on the Nasdaq include: (i) June 27, 2025, following the positive news of a Wall Street firm initiating coverage on Datavault, 61,000 shares were sold at or near the close in a span of 15 minutes; and (ii) June 23, 2025, the date on which Datavault published a press release announcing the allowance for nine groundbreaking patents, including industry standard carbon credit tokenization and acoustics, 369,000 shares were sold at the close at 4:00 PM (EDT).

---

[7] *E.g.*, Thomas C. Kocherhans, Exchange Act Release No. 36556, 60 SEC Docket 2211 (Dec. 6, 1995).
[8] *Id.* at 2212.

85. Upon information and belief, yet another such fraudulent manipulative device employed by Defendants against Datavault and its common stock is "spoofing." Such non-bona fide orders are made visible to the market to briefly set a new best bid or offer, often to narrow artificially the National Best Bid / Offer spread[9] in order to inflate or suppress the market price of a security at issue to the advantage of the trader. For example, on July 9, 2025, at or about 2:00 PM EDT, an offer to sell 200,000 shares at $0.71 appeared on the offer side of the market, when the bid price was $0.69. That offer posted for seconds and then disappeared. The fraudulent implication to the market for Datavault stock of the posted offer to sell was to create the materially false and misleading impression that a John Doe was looking to "dump" 200,000 shares to exit a position in Datavault common stock.[10]

86. From January 2, 2025 until July 7, 2025, despite the consistent positive information published and disclosed, the stock price of Datavault has decreased by $1.37 (67%), from $2.04 at the close of January 2, 2025 to $0.67 at the close of July 7, 2025.

## VIII. CLAIMS FOR RELIEF

### Count I – Securities Fraud (Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder) (Against all Defendants)

87. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

88. Datavault's common stock is a "security" within the meaning of Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)] and is an "equity security" within the meaning of Section 3(a)(11) of the Exchange Act [15 U.S.C. § 78c(a)(11)].

---

[9] The National Best Bid / Offer is a quote that reports the highest visible bid price and lowest visible ask price in a security.

[10] The practice of stacking sell orders, often just off the "ask" price to create the false and artificial perception of strong selling interest and then removing the sell orders itself is a manipulative practice referred to as "layering."

89. Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of any security, with scienter, using the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and courses of business which operated or would have operated as a fraud or deceit upon others, including, but not limited to engaging in the fraudulent schemes described herein, and making materially false and misleading statements.

90. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] ("Section 10(b)") and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5] ("Rule 10b-5").

91. Section 10(b) and Rule 10b-5 allow private rights of action against primary violators of those provisions. *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).

92. As a direct and proximate result of Defendants' securities fraud, Plaintiff has suffered damages in connection with and as a result of the disseminaton of materially false and misleading information about Plaintiff.

93. As a direct and proximate result of Defendants' securities fraud, Plaintiff has suffered damages in connection with and as a result of the manipulative trading of the common stock of Datavault.

94. As a direct and proximate result of Defendants' securities fraud, Plaintiff has suffered damages in connection with and as a result of the naked short selling of the common stock of Datavault.

**Count II – Defamation Per Se**
**(Against all Defendants)**

95. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

96. Plaintiff and its shareholders have the right to respect, confidence, and esteem of their business peers, the general public, and others in its community.

97. Beginning no later than January 1, 2025, Defendants, including John Does identified herein as "Anonymous" and "LIP," falsely and inappropriately made the allegations contained herein.

98. These false, defamatory comments by Defendants were a direct smear on the character of Plaintiff and its representatives. These statements were intended to, and did, lower Plaintiff in the estimation of their current and prospective shareholders, excited derogatory opinions about Plaintiff to public contempt, ridicule, aversion or disgrace, and generally induced an evil opinion of Plaintiff in the minds of their own shareholders and the public in general.

99. The defamatory comments were made by Defendants, notwithstanding that Defendants knew that the defamatory comments were false and misleading or omitted to disclose material facts; or, the statements were made in reckless disregard of the truth; or, the statements were made in negligent disregard for the truth; or, the statements were made with intent to injure Plaintiffs in their names and reputations.

100. The defamatory comments were not privileged, and Defendants published and spoke them with malice in fact. Defendants had no right or duty to make any of the defamatory comments.

101. The defamatory comments were transmitted by Defendants, including the John Doe Defendant identified as "Anonymous," and each of them, at least on Stockwits.

102. The defamatory comments were transmitted by Defendants, including the John Doe Defendant identified as "LIP," and each of them, at least on LinkedIn.

103. The defamatory comments made by Defendants, including John Doe Defendants identified as "Anonymous" and "LIP" were false.

104. Defendants' actions, including the actions of John Doe Defendants identified as "Anonymous" and "LIP," directly and proximately caused Plaintiff damages by virtue of loss in reputation and name; damage to its property, business, trade, or occupation; present and future diminished income; market value of its securities, loss of contracts and loss of professional opportunities.

105. Plaintiff has sustained in excess of $75,000.00 in damages arising from Anonymous and LIP's conduct.

106. As a further proximate result of Defendants' unlawful conduct, including the unlawful conduct of John Doe Defendants identified as "Anonymous" and "LIP," Plaintiff suffered special damages in an amount to be proven at trial.

107. Plaintiff has been required to retain the services of an attorney to represent Plaintiff in this matter and should be awarded a reasonable sum for its attorney's fees and costs.

**Count III – Intentional Tort by Wire Fraud**
**(Against all Defendants)**

108. Plaintiff realleges and incorporates the foregoing paragraphs herein by reference.

109. Title 18 United States Code section 1343, the federal criminal wire fraud statute, defines wire fraud as "[w]hoever, having devised … any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or

promises, transmits or causes to be transmitted by means of wire … in interstate … commerce, any writings … for the purpose of executing such scheme or artifice….”

110. Violation of a criminal statute may constitute an intentional tort; and violation of the federal criminal wire fraud statute can serve as a predicate act for asserting Racketeer Influenced and Corrupt Organizations Act violations.

111. Defendants devised a scheme or artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises and transmitted and caused to be transmitted writings by means of wire in interstate commerce for the purpose of executing the scheme and artifice against Plaintiffs to obtain the sum of $75,000.

112. As a direct and proximate result of Defendants' intentional tort of wire fraud, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants

## IX. JURY TRIAL DEMANDED

113. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a jury trial on all the issues so triable.

## X. REQUESTED RELIEF

WHEREFORE, premises considered, Plaintiff respectfully requests that this Court enter a judgment in favor of Plaintiff against Defendants:

i. For compensatory and special damages in an amount to be determined at trial;

ii. For prejudgment interest and post-judgment interest;

iii. For costs incurred in this action;

iv. For reasonable attorneys' fees;

v. For such other and further relief as the Court deems just and appropriate.

July 10, 2025

Respectfully Submitted,

**DICKINSON WRIGHT PLLC**

*s/ David S. Becker*
David S. Becker, IL Bar No. 6271932
55 West Monroe, Suite1200
Chicago, IL 60603
Tel: (312) 377-7881
Fax: (844) 670-6009
DBecker@dickinsonwright.com

Jacob S. Frenkel, MD Bar No. 199206092
(*Pro Hac Vice* Application Forthcoming)
1825 I St., N.W., Suite 900
Washington, DC 20006
(202) 466-5953 / (844) 670-6009 (Fax)
JFrenkel@dickinsonwright.com

Brooks T. Westergard, NV Bar No. 14300
(*Pro Hac Vice* Application Forthcoming)
100 West Liberty Street, Suite 940
Reno, Nevada 89501-1991
(775) 343-7500 / (844) 670-6009 (Fax)
BWestergard@dickinsonwright.com

**ATTORNEYS FOR PLAINTIFF**
**DATAVAULT AI, INC.**